Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1870 | **DATE** | 4/4/2002 |
| **CASE TITLE** | | Shannon vs. Advocate Health Centers, Inc. | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant's motion for summary judgment is granted [#22] with respect to plaintiff's claim of racial harassment, constructive discharge, and retaliation. The motion is denied [# 22] with respect to plaintiff's claim of discrimination in her application for a position at South Suburban Hospital. A status hearing is set for Thursday, April 18, 2002 at 9:30 a.m. to set a pre-trial order. In the meantime, parties are directed to meet together in a sincere effort to resolve this case short of trial.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | APR 08 2002 date docketed | |
| | Notified counsel by telephone. | | | 46 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | 4/5/2002 date mailed notice | |
| | Copy to judge/magistrate judge. | 02 APR -5 PM 12:04 | | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOYCE D. SHANNON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 00 C 1870 |
| ADVOCATE HEALTH CENTERS, INC. | ) ) ) |
| Defendant. | ) |

**DOCKETED APR - 8 2002**

## MEMORANDUM OPINION AND ORDER

Before the court is the motion by defendant, Advocate Health Centers, Inc. ("Advocate"), for summary judgment on plaintiff Joyce D. Shannon's ("Shannon") Title VII claims, which claims are not separately set out in the complaint but are conceded by defendant to be racial harassment, constructive discharge, discrimination in hiring, and retaliation. See Fed. R. Civ. P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Jurisdiction is invoked pursuant to 42 U.S.C. § 2000e-5(f). For the reasons stated below, the court amends its earlier order and grants in part and denies in part defendant's motion for summary judgment.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Shannon is an African-American woman who in January, 1999, began working for Advocate as the Director of Health Information Technology. She was assigned to Sykes Health Center ("Sykes"), one of defendant's thirteen ambulatory care (outpatient) health centers within the Chicago area. Shannon reported to Joan Syer ("Syer"), Vice President of Operations. Shannon's salary was $74,000 annually. Scott Sarran, M.D., ("Sarran") was Vice President of Medical Management, and his responsibilities included the supervision of the medical directors and physicians for each health center. During her employment with Advocate, Shannon worked on various projects with Sarran. Although Sarran had no direct supervisory responsibility over her, Shannon's activities supported Sarran's work, so Sarran's approval was important to

2

Shannon's success in her position. Sandra Davis Houston ("Houston"), also African-American, was the Vice President for Human Resources for Advocate and Sykes.

Advocate has an employee handbook that includes a policy of equal opportunity, including affirmative action, and explicitly forbids "conduct which negatively affects other associates' work performance or that creates an intimidating hostile or offensive work environment." The handbook also sets out a procedure by which an employee may register a complaint of harassment and which provides that the employee "should" inform the offender and "should" report any incident to a superior, who "must" report it to the human resources department. Shannon was aware of the policy.

During the course of Shannon's employment, she as well as Sarran and others attended senior management meetings, which were held on a weekly basis. At such meetings, generally, each person present gave a report or general update regarding her or his area of responsibility. Beginning in the spring of 1999, Shannon perceived that during all of those meetings--specifically she remembered three occasions--Sarran lashed out at her, interrupted her, or cut her off every time she started to speak, spoke to her "condescendingly" in an abrasive, harsh, boisterous tone of voice, and was unsupportive of any effort to work things out between them. While Sarran interrupted other individuals, Sarran did not treat other persons participating in the meetings in a similarly harsh manner. Sarran also did not return Shannon's phone calls and did not spend equal time with her as he did with white females.[1] Shannon identified "various" white, female directors and Syer as individuals with comparable (though, of course, different)

---

[1] The deposition of Sarran accompanying defendant's motion reflects that he was unaware of his effect on Shannon. He perceived her as "pleasant and professional and attempted to do her job." (Shannon Dep. at pp. 15-16.) He was not aware of Shannon's concerns about how he treated her at the management meetings. (*Id.*)

3

responsibilities who received the time, interest and approval of Sarran needed to move their projects forward. On two occasions, Sarran circumvented Shannon's authority by assigning two of her projects to white co-workers.

After a few of the management meetings, Shannon told Syer that she felt Sarran's behavior was inappropriate, although she did not link it to race in that conversation. Shannon felt that Syer was dismissive of her complaint. At some point Shannon reported to Maurejean Edwards ("Edwards") (also African-American), a human resources specialist who was acting in the role of Director of Human Resources at the time (apparently the position was vacant and Edwards had assumed interim responsibilities). Shannon told Edwards that she felt that Sarran picked on her and was racist, and she wanted to leave or transfer because she could not tolerate his treatment of her. Edwards, in her deposition, expressed considerable empathy with Shannon's views, although she perceived the environment more as gender-biased than race-biased, also noting a corporate culture in which the physicians were treated as "gods" and basically their rude behavior was tolerated by everyone. Edwards, who also felt she lacked management support or authority to do anything about the problem, conceded that perhaps she did not take Shannon's complaints seriously enough at the time. Edwards advised Shannon, however, to document Sarran's conduct and convey her concerns to Houston, Syer and Sarran, or the Chief Executive, Dr. Weis ("Weis"). Shannon responded that she did not trust Houston, and that she could not talk to Syer and Sarran (beyond what she had already done) or Weis. Edwards did pass along Shannon's complaint to Houston (yet without mentioning Shannon's comments that she thought Sarran was a racist), but Houston did not respond. Edwards observed that Houston was unable to "stand up to" Sarran and would more or less conform to his wishes.

4

On August 23, 1999, Syer met with Shannon to formally review and complete her first six-month job performance review. Syer rated Shannon overall as "satisfactory" and noted that she required development in four of nine performance areas reviewed. Shannon did not receive any "strong" ratings.

The following day, on August 24, Shannon submitted her letter of resignation to Syer, effective September 24, 1999. Shortly after receiving Shannon's resignation letter, Syer met with Shannon to discuss her resignation and future plans. Shannon expressed her lack of support from management, that "maybe" her strengths were in "acute care" (a hospital setting), and that she wanted to apply for an open position at South Suburban Hospital in acute care. To accommodate Shannon, Syer held back Shannon's first evaluation while Shannon's application to transfer was pending. Syer promised to give Shannon a good reference. Moreover, Advocate admits that if internal candidates are qualified for open positions, they are given preference over outside candidates. (Ans. ¶ 25.)

Shannon initially interviewed for the Manager of Medical Records position at South Suburban Hospital with two African American female recruiters. Only one other candidate, Darla Lopez ("Lopez"), an external applicant who is white, interviewed for the position. Both Shannon and Lopez met individually with Brian Kelly ("Kelly"), Vice President of Finance, at the hospital. During this interview, he asked the candidates about their salary requirements, among other topics of conversation. Next, he directed them to be interviewed by two medical records supervisors, Donna Berk ("Berk") and Diane Schmidt ("Schmidt"), who would be working under the new hire and he wanted to make sure they would be "comfortable" with the person selected. Shannon reported that during that interview either Berk or Schmidt commented

5

to the other that she "wondered if the staff would be open to change." Kelly consulted Berk and Schmidt about the candidates, but he had the ultimate authority to hire. Kelly believed the candidates were equally qualified for the manager of medical records position. He testified that he selected Lopez because she had recently implemented a work-at-home medical transcription program, which was an initiative being worked on at the time at South Suburban Hospital, and Lopez was seeking a salary in the mid-$50,000 range, which was considerably lower than what Shannon was earning at the time. He considered that the maximum in the pay range for the position at the time was $76,588. Kelly believed that a candidate's salary requirement is important because "where they — fit in the pay range" would determine the "kind of pay raises . . . they can earn in the position," and "[y]ou typically would want a candidate with room to grow financially within the position." Shannon told Kelly that she was at a level of roughly $72,000 and was comfortable at that rate of pay,[2] but she also told Kelly that salary was not an issue for her as she wanted to work closer to home. Shannon had earlier been told by Edwards that the transfer might entail a 10 per cent pay cut. Kelly hired Lopez at a salary of $57,000.

When Shannon was informed that she was not selected for the position, she responded that she felt her race was the reason, and she revealed the comment made by Berk or Schmidt during the interview. Upon learning this information, Kelly, Houston and others investigated the matter, and Kelly met with Berk and Schmidt, both of whom indicated that they did not recall making the statement. Shannon's previously submitted resignation became effective September 24, 1999.

---

[2]Plaintiff objects to this statement as hearsay. The statement is not hearsay and is admissible under Fed. R. Evid. 801(d)(2)(A). Inasmuch as plaintiff does not deny that she made the statement, it is accepted as true.

6

## ANALYSIS

A. **The racial harassment and constructive discharge claims**

"It is well established that conditions of employment that are designed to harass and humiliate employees because of their race are actionable adverse employment actions under Title VII." *Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001-02 (7th Cir. 2000), citing, *inter alia*, *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 (7th Cir. 1996). The test applied to racial harassment is parallel to that applied in the context of sexual harassment. *Mason v. SUI*, 233 F.3d 1036, 1043 (7th Cir. 2000). To make out a claim of racial harassment under Title VII, a plaintiff must show both objectively and subjectively that her workplace was hostile. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1996). To meet the objective prong, plaintiff must show that the harassment was "sufficiently severe or pervasive as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999), quoting *Doe v. R.R. Donnelley & Sons*, 42 F.3d 439, 443 (7th Cir. 1994).[3]

Plaintiff has established that from her subjective standpoint the environment surrounding Sarran was sufficiently severe or pervasive as to alter the conditions of her employment, leading her to believe that her only escape was to quit or transfer. With regard to the objective prong, however, she cannot survive summary judgment. "An objectively hostile environment is one that

---

[3]"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, . . . that (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

7

a reasonable person would find hostile or abusive." *Adusumilli*, 164 F.3d at 361, citing *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). And although not clearly required, the court will view the reasonable person as of the same race in plaintiff's position. *See* 3 LARSON, EMPLOYMENT DISCRIMINATION §52.02 (2001) ("It is not inconsistent for that objective review to consider the perspective of person's [*sic*] of the alleged victim's race . . ."). In determining whether the plaintiff meets this standard, the court must consider all the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.'" *Adusumilli*, 164 F.3d at 361, quoting *Harris*, 510 U.S. at 23. As otherwise characterized in a case of racial harassment, "the court may consider: the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers, and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment." *Daniels* v. *Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir. 1991). Shannon's evidence is that Sarran was consistently rude and dismissive towards her and swore at her several times during weekly meetings; he spent more time with and was more supportive of similarly situated white women; and he assigned two of her projects to white women. Although perceived the conduct as racist, other witnesses did not perceive it as such.[4]

---

[4]Houston, who is also African American, attended these senior level meetings on occasion. Plaintiff appears to use Edwards' deposition testimony that Houston was tolerant of Sarran's and Weis's behavior to deflect the absence of evidence that other African-Americans within Advocate viewed their conduct as racist. This type of evidence is in the "scintilla" category, insufficient to create an issue of fact.

8

And while plaintiff perceived that Sarran did not treat other persons participating in the meetings in the same manner, and that white women received more time and attention from Sarran, plaintiff's testimony is subjective and cannot meet the objective prong of her proof, again, as none of plaintiff's witnesses will testify that this was so.[5] When Shannon spoke to Syer about Sarran, Shannon did not link his behavior to racism. Edwards, who shared Shannon's race, perceived the environment more as gender-biased than race-biased, and cited as well tolerance within the culture of a physician's bad behavior. Even if the conduct was objectively racist, the court cannot infer, that the conduct was "pervasive" in that Shannon did not work directly with Sarran and the meetings were but once a week (although it is not known how long the meetings lasted or how many exchanges between Shannon and Sarran occurred, the clear inference from the record is that only minutes were involved), and Sarran was not physically threatening towards Shannon. Of course, there is no precise litmus test for where rudeness *vel non* becomes harassment, but plaintiff cites not a single case of racial harassment in her brief, and the court knows of no case in which conduct similar to that Shannon describes has survived summary judgment.[6] *Compare Turner v. Micro Switch*, No. 98 C 50276, 2001 WL 13255, at *6 (N.D. Ill. Jan. 3, 2001) (coworker's unfriendliness, refusal to return greetings, did not constitute racial harassment); *Turner v. Marshall Field & Co.*, No. 97 C 6354, 1999 WL 168465, at *11 (N.D. Ill. Mar. 18, 1999) (plaintiff was unable to support his allegations that many of the employment actions about which he complained were based on his race); *cf. Minor v. Ivy Tech State College*, 174 F.3d 855,

---

[5]Although it is true, as plaintiff points out, that "[t]he Seventh Circuit has never required an employee's allegations of . . . harassment to be corroborated by other employees," here the issue is not one of corroboration but whether a reasonable employee observing the behavior would perceive it as racist.

[6]The evidence that Sarran assigned two of her projects to white women is evidence of disparate treatment but it sheds little light on a hostile environment claim.

9

858 (7th Cir. 1999) (in professional situation, court stated that a supervisor or coworker who fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor, is not classified as discriminatory.). Further, even rudeness that is tantamount to harassment is not actionable unless an inference of discrimination against a member of a protected class under Title VII can be drawn, and that inference cannot be drawn from this evidence. *See Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994) (plaintiff has to show that, "because of her sex," she was subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked; for Title VII is not directed against unpleasantness per se but only, so far as relates to this case, against discrimination in the conditions of employment."). For these reasons, the court will grant summary judgment on the racial harassment claim.

Because plaintiff cannot establish that her working conditions were objectively intolerable because of race discrimination, her claim for constructive discharge must also fail. *See West v. Maxon Corp.*, No. IP 98-0339-C T/K, 2001 WL 1712511, at *7 (S.D. Ind. Dec. 10, 2001), citing *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (quoting *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir.1998)); *see also Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996) ("Establishing constructive discharge is a two-step process. First, a plaintiff needs to show that her working conditions were so intolerable that a reasonable person would have been compelled to resign. Second, the conditions must be intolerable because of unlawful discrimination."). The court will grant summary judgment on that claim as well.

10

## B. Discrimination regarding transfer application

Plaintiff relies on the familiar burden-shifting method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* burden-shifting analysis, plaintiff bears the initial burden of establishing a prima facie case. Plaintiff must establish that she applied for and was qualified for the position and that a person outside her protected group was selected. If plaintiff establishes a prima facie case, then the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Richter v. Hook-Superx, Inc.*, 142 F.3d 1024, 1028 (7th Cir. 1998). If defendant establishes this burden, then the burden shifts back to plaintiff to prove that defendant's articulated reason is only a pretext for discrimination. *Richter*, 142 F.3d at 1028. "In order to show pretext, [plaintiff] must demonstrate that [defendant's] proffered reason is a lie or completely lacks factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) "[Her] proof would at that point be sufficient to support an inference that the company's real reason was discriminatory." *Hoffman v. MCA, Inc.* 144 F.3d 1117, 1123 (7th Cir. 1998) (internal quotation omitted); *see also Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133 (2000) ("the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual,'" quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If plaintiff raises an inference of discrimination she has not won her case. She has merely produced enough evidence to defeat summary judgment and proceed to trial. *Hoffman*, 144 F.3d at 1123, citing *St. Mary's Honor Ctr.*, 509 U.S. at 519.

The elements of Shannon's prima facie showing are undisputed for purposes of the motion. Thus, the burden shifts to Advocate to articulate its reason for not selecting plaintiff over Lopez. Advocate proffers legitimate, nondiscriminatory reasons for hiring an external candidate: Lopez had a lower salary requirement than plaintiff and had a particular skill or experience: implementing a work-at-home medical transcription program. Next, Shannon must proffer evidence that would permit an inference that Kelly was lying about these reasons. Shannon relies on two facts: she told Kelly that salary was not important to her but he professed concern about salary; and Advocate's admission that if two candidates are equally qualified, the insider has preference.

The ultimate question on this motion is whether a reasonable jury could infer from the testimony of the witnesses that Kelly was lying about the reasons for choosing Lopez. If the jury were to believe Shannon with regard to her testimony that she made it clear to Kelly that she did not mind working for substantially less pay, it is possible that the jury might also infer that Kelly's emphasis on salary was a diversion from his real reservation about Shannon, her race.[7] Under these circumstances, the court concludes that a genuine issue of fact exists for which a trial is necessary. Therefore, the court will deny summary judgment on this claim.

C.  **The retaliation claim**

Plaintiff's claim for retaliation is that Advocate refused to transfer her to the South Suburban position because of her express opposition to racial harassment. To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in statutorily protected activity;

---

[7]There is also evidence, although not relied on by the plaintiff for this purpose, that a comment was made by Berk or Schmidt that might be interpreted as discomfort with an African-American in the position. Kelly consulted Berk and Schmidt before making his decision.

12

(2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1038-39 (7th Cir. 1998), citing *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 397 (7th Cir. 1998). If she establishes these elements, Advocate has the burden to produce a legitimate, nondiscriminatory reason for its actions. Once this reason is produced, plaintiff must prove that the reason is pretextual. *Parkins*, 163 F.3d at 1039. Even if plaintiff were to establish that she engaged in protected activity which is not clear (Syer did not understand plaintiff's complaints to be complaints of race discrimination and Edwards thought she was just "venting" rather than making a complaint), there is no evidence of a causal link between that activity and the adverse action, in this case selecting Lopez over plaintiff for the position at South Suburban Hospital. To conclude otherwise would be pure speculation. Indeed, it appears that Syer withheld the evaluation in order to assist plaintiff in her effort to transfer and offered to give her a favorable recommendation. There is no evidence of any contact between Kelly and persons at the Sykes facility that led or even might have led Kelly to believe that Advocate was disturbed about Shannon's complaints of harassment. Plaintiff's counsel relegation of this argument to a footnote in plaintiff's brief perhaps best conveys the weakness of her claim. Summary judgment will be granted on the retaliation claim.

13

## ORDER

For the reasons stated above, the defendant's motion for summary judgment is granted [#22] with respect to plaintiff's claim of racial harassment, constructive discharge, and retaliation. The motion is denied [# 22] with respect to plaintiff's claim of discrimination in her application for a position at South Suburban Hospital. A status hearing is set for Thursday, April 18, 2002 at 9:30 a.m. to set a pre-trial order. In the meantime, parties are directed to meet together in a sincere effort to resolve this case short of trial.

ENTER: _____
Joan Humphrey Lefkow
United States District Judge

Dated: April 4, 2002